646 So.2d 818 (1994)
JUNO INDUSTRIES, INC., et al., Faye C. Hefner and Donna Kevech, Appellants,
v.
HEERY INTERNATIONAL, etc., et al., Appellees.
Nos. 93-796 to 93-799, 93-828 and 93-858.
District Court of Appeal of Florida, Fifth District.
December 9, 1994.
*820 Patricia M. Gibson of Maher, Gibson & Guiley, P.A. and Dennis J. Wall, Orlando, for appellants Faye Hefner, Donna Kevech and Bill Bielawski.
Judith J. Flanders of Lane, Trohn, Clarke, Bertrand, Vreeland & Jacobson, P.A., Lakeland, for appellant Juno.
David A. Higley of Higley & Barfield, P.A., Maitland, for appellant Plexco.
John C. Briggs of Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, P.A., Orlando, for appellee Heery Intern., Inc.
Robert E. Bonner of Eubanks, Hilyard, Rumbley, Meier and Lengauer, P.A., Orlando, for appellees Walt Disney World Co. and Walt Disney Imagineering, Inc.
THOMPSON, Judge.
This case involves a consolidated appeal in a personal injury case. Because the parties and the issues arise out of the same personal injury lawsuit, they have been consolidated for purposes of appeal. We have jurisdiction. Fla.R.App.P. 9.030(b)(1)(A) & 9.110(k); see Aagaard-Juergenson, Inc. v. Lettelier, 540 So.2d 224, 224-25 n. 1 (Fla. 5th DCA 1989). The plaintiffs below, the personal representatives of the estate of Lawrence E. "Buddy" Hefner, Faye C. Hefner, and William Bielawski, III, along with cross-claimants below, Plexco, a Division of Amstead Industries, Inc. (Plexco) and Juno Industries, Inc. ("Juno"), appeal the final summary judgment granted in favor of defendants Heery Engineering, Inc.[1] ("HE"), Heery Program Management, Inc. ("HPM"), Heery International, Inc.[2] ("HI"), Walt Disney World Co. and Walt Disney Imagineering, Inc. ("Disney"). We affirm in part and reverse in part.

HISTORY OF THE CASE
On 25 April 1988, Buddy Hefner and Bill Bielawski were working construction on the Typhoon Lagoon project at Disney World. They were employees of a general contractor, Frank Irey, Jr., Inc. ("Irey"), on bid package 2A for the project which included process piping for the flume rides. A 22-inch polyethylene pipe which was being pneumatically (air) tested came apart at a fused weld and whipped around striking Hefner and Bielawski. The pipe failed due to a "cold fusion" which results from the polyethylene not becoming hot enough before the ends of the pipe are merged together. Hefner was killed and Bielawski injured.
HI, the parent company of HE and HPM, contracted with Disney to provide design and engineering services for the project. HE performed the engineering services for the project under the contract between HI and Disney. HPM entered into a separate contract with Disney to provide program management/construction manager services for the project. Irey was the general contractor on bid package 2A, the portion of the project this case concerns. Irey ordered the pipe from Juno, who, in turn ordered the pipe from Plexco, the pipe manufacturer; Juno then used a fusion machine to weld the pipe together. The pipes were then left for Irey to install. The pipe had to be pressure tested to check the fusion welds after installation in the trenches.
HE prepared contract specs which called for hydrostatic (water) testing of the pipe in accordance with American Water Works Association (AAWA) standard C600-77 and for *821 backfill to be installed along the pipe to prevent displacement during pressure testing. Plexco's manual also called for water testing and backfilling before pressure testing unless otherwise specified by the engineer. However, Irey tested the pipe using air without backfilling first. Backfilling is simply covering the pipe to be tested with either soil or cement, except at the joints. The joints are left exposed to see if there is any failure of the joints. Backfilling prevents the pipe from becoming unstable if there is a failure. Irey used air rather than water to test the pipe because no water was available on the site and Irey did not want to truck water to the site. Prior to conducting the air tests, according to William Irey, vice president of Frank Irey, Jr., Inc., Irey discussed the possibility of substituting the air testing for water testing and authorization was granted either from one of the Heery companies or from Disney. He recalled speaking with Roger Ellis of HE about the change in testing procedures. Ellis was HE's employee in charge of inspection services and engineering services. His job was to be sure that the site was built to HE's specifications. He was HE's quality control representative on the site. Ellis remembers the conversation with Irey and did not object to the change of testing mediums.
The plaintiffs filed complaints which were amended prior to the entry of final summary judgment by the trial court. The second amended complaints allege causes of action in strict liability and negligence against Juno, and negligence counts against Plexco, all Heery defendants and Disney. Juno and Plexco each filed cross-claims for contribution against all Heery defendants alleging that one or more of them were negligent in authorizing the substitution of air testing for water testing, causing the plaintiffs' injuries. The question the lawsuit presented to the trial court was who had the responsibility by contract, by their actions or by common-law for the safety of the workers? Which entity or entities owed a duty to the workers? Which entity or entities violated that duty? More precisely, who was responsible for safety at the time the test was conducted and who authorized the change from water testing to air testing? Expert testimony established that air testing is more dangerous because air can be compressed and water cannot. Compression allows air to store a great deal more energy and creates a potential for a more violent failure than water testing, which is why Plexco's literature and HE's specifications require water testing.
On 28 July 1992, each of the Heery and Disney defendants moved for summary judgment on the basis that they owed no duty to the plaintiffs. On 14 December 1992, the trial court granted HPM's motion. On 26 January 1993, the court granted Disney's motions. On 1 February 1993, the court granted HE's and HI's motions. The court based each of the summary judgment rulings on the finding that none of the Heery or Disney defendants owed any of the alleged duties to the plaintiffs. On 26 February 1993, the court granted the Heery defendants' motion for summary judgment as to Juno's cross-claim on the basis that, since the court had granted Heery's motions as to the plaintiffs, Heery could not be subject to Juno's cross-claim for contribution. On 8 March 1993, the trial court entered final summary judgment in favor of all the Heery and Disney defendants and, consequently, dismissed Plexco's cross-claims with prejudice. In ruling on the motion, the court considered the contracts involved and several depositions regarding the conduct of HE and HPM. This court must determine whether the summary judgments were improvidently entered.

I. SUMMARY JUDGMENT IN GENERAL
The party moving for summary judgment has the burden to prove conclusively the nonexistence of any genuine issue of material fact. Holl v. Talcott, 191 So.2d 40, 43 (Fla. 1966). The burden of proving the existence of such issues does not shift to the party opposing summary judgment until the movant has successfully met its burden. Id. at 43-44. "If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it." Moore v. Morris, 475 So.2d 666, *822 668 (Fla. 1985). The trial court may not determine factual issues nor consider either the weight of the conflicting evidence or the credibility of witnesses in determining whether a genuine issue of material fact exists in a summary judgment proceeding. State v. West, 262 So.2d 457, 458 (Fla. 4th DCA 1972) (quoted in Security First Fed. Sav. & Loan Assoc. v. Broom, Cantrell, Moody & Johnson, 560 So.2d 304, 307 (Fla. 1st DCA 1990), disapproved on other grounds, Garden v. Frier, 602 So.2d 1273, 1277 n. 10 (Fla. 1992)); see also Aagaard-Juergenson, 540 So.2d at 225.

II. SUMMARY JUDGMENT AS TO DISNEY
As to Disney, the trial court's ruling granting summary judgment was proper; there is no genuine issue of material fact. The appellants pled that Disney was liable based upon two general theories: Disney actively participated in the construction of the Typhoon Lagoon project and became responsible for the safety of the employees on the work site, and; Disney was vicariously liable for the decisions of HPM that allowed changes in the testing method and the curvature of the pipe. In this case, the written contract between Disney and Irey clearly shows that Irey was the independent contractor responsible for the safety of the 2A phase of the project. The contract between Disney and Irey provides:
4.3 LIMITATIONS ON RESPONSIBILITY. The Engineer shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs, in connection with the Work, and it shall not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents. The Engineer shall not be responsible for the acts or omissions of the Contractor, and Subcontractors, any of their agents or employees or any other persons performing any of the Work.
.....
5.2.1 The Contractor shall supervise and direct the Work using its best skill and attention. The Contractor shall be solely responsible for all construction means, methods, techniques, sequences and procedures, and for all safety precautions and programs, in connection with the Work as well as for coordinating all portions of the Work.
Additionally, ARTICLE 10 "PROTECTION OF PERSONS AND PROPERTY," Section 10.1 "RESPONSIBILITY FOR PERSONS AND PROPERTY," provides:
10.1.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work. The Contractor shall take all precautions and follow all procedures for the safety of, and shall provide all protection to prevent injury to, all persons involved in any way in the Work and all other persons, including without limitation the employees, agents, guests, visitors, invitees and licensees of the Owner who may be affected thereby. These precautions shall include, but in no event be limited to: the posting of danger signs and personal notification to affected persons of the existence of a hazard of whatever nature; ...
The appellants pled that Disney was liable because of its negligence. Under Florida law, an owner is generally not liable for injuries sustained by an independent contractor's workers if they are injured on the job. City of Miami v. Perez, 509 So.2d 343 (Fla. 3d DCA 1987), review denied, 519 So.2d 987 (Fla. 1987). The written contract between Disney and Irey clearly shows that Irey was responsible for the safety of the workers on the 2A project. Disney could, however, be liable if it became actively involved or participated in the construction of the Typhoon Lagoon project to the extent of assuming the detailed direction of the project, effectively becoming the master of the independent contractor's workers. Or, if Disney remained a passive nonparticipant, Disney could be liable if it committed one or more specific acts of negligence which created or approved a dangerous condition resulting in death or injury to a worker. Such actions would remove Disney from its exclusive role as owner and permit Disney to be held liable. Id.; accord Conklin v. Cohen, 287 So.2d 56, 61 (Fla. 1973).
*823 Although Disney did have employees on the job site, appellants did not present any evidence that Disney's employees supervised any of Irey's employees on the 2A project. There is no testimony in the record that Disney supervised anyone. Disney did have staff architects present to make sure there was compliance with the terms of the contract, but none of Disney's staff supervised or attempted to supervise anyone. Just because an owner has the right to inspect work for conformance with the contract does not change the owner from a passive nonparticipant to an active participant in the construction with the right to supervise or control the work, nor does it destroy the independent status of the contractor and render the owner liable for the contractor's negligence in performing the work by creating a dangerous condition. Coudry v. City of Titusville, 438 So.2d 197 (Fla. 5th DCA 1983). Since no proof was presented in support of this theory, it must fail.
The appellants also argued that Disney was vicariously liable because it actively participated in the construction via its agent, HPM, and HPM allowed changes in the testing method and the curvature of the pipe called for in the original plans. In order for Disney to be liable for HPM's conduct, the appellants must prove that Disney was the principal and HPM was Disney's agent, i.e., that Disney controlled HPM. See Dorse v. Armstrong World Indus., Inc., 513 So.2d 1265 (Fla. 1987); Folwell v. Bernard ex rel. Bernard, 477 So.2d 1060 (Fla. 2d DCA 1985), review denied, 486 So.2d 595 (Fla. 1986). The appellants provided no proof to support this claim.
HPM contracted with Disney to provide a construction program manager (CPM) "to provide an on-site management team to provide contract administration as an agent of the owner and to establish and implement coordination procedures between the Owner (Disney), Design Consultant, and all prime contractors and suppliers." HPM also contracted to establish submittal procedures and to maintain records on the project; to administer the contract; and to establish and maintain a testing program. HPM had no contractual obligation to supervise, control or give advice regarding the construction of Typhoon Lagoon, nor was any proof offered to show that Disney gave HPM such authority outside of the contract. The construction was exclusively Irey's obligation, with engineering changes to be approved by Disney or HE. Therefore, even assuming, arguendo, that HPM could be viewed as Disney's agent, HPM's conduct could not be imputed to Disney because any actions taken by HPM in supervising, controlling or advising Irey regarding construction would have been outside HPM's agency relationship with Disney. Furthermore, appellants' attempt to impute knowledge of one corporate defendant to another corporate defendant is unavailing. The record establishes that HE was responsible for authorizing the change in the curvature of the polyethylene pipes and that Roger Ellis of HE did not object to pneumatic testing in lieu of water testing when this change was presented to him by Irey. It does not show that HPM approved any changes. (See heading IV., infra.)
Absent proof that Disney controlled HPM or that HPM was acting within its agency agreement with Disney, this theory must fail. Accordingly, the trial court properly granted the motion for summary judgment as to Disney.

III. GENERALLY AS TO THE HEERY DEFENDANTS
The trial judge, after reviewing all of the pleadings and the depositions, ruled that the contracts between the Heery defendants, who are engineers and architects, and Disney did not require the Heery defendants to undertake a duty to ensure the safety of the workers on the job site. Absent a contractual basis to provide for the safety of workers, the Heery defendants can not be held liable for injuries sustained by workers unless the Heery defendants violated a common law duty of care to those who may foreseeably be injured if the professionals negligently performed their services. Conklin, 287 So.2d 56; Geer v. Bennett, 237 So.2d 311 (Fla. 4th DCA 1970). The trial judge found that the contracts were unambiguous and that the duty to provide for workers' safety on the 2A phase of the project was placed upon the *824 independent contractor, Irey. The judge also found that neither the injury nor death was proximately caused by either a defect in the plans or specifications of HI, a breach of a duty to supervise for safety assumed outside the contract by HE, or a failure to warn the owner or contractor of a dangerous condition of which the Heery defendants had "actual knowledge," as opposed to a dangerous condition the Heery defendants should have known of. In other words, none of the Heery defendants assumed responsibility for safety as part of their supervisory duties discharged on behalf of the owner.

IV. SUMMARY JUDGMENT AS TO HPM
The appellants offer a number of theories to establish that HPM was negligent and to establish that the entry of summary judgment should not have been granted. Juno argues that HPM contractually agreed to be responsible for safety. Therefore, it was HPM's responsibility to see that water was used instead of air for pressure testing, and that established safety procedures such as backfilling were used during the test of the pipe. The fact that there were disputes between HPM and Disney as to whether HPM was responsible for safety, together with a letter that HPM wrote to remind contractors that they needed a safety program, raises an inference that HPM did have a contractual duty in regard to safety, the appellants argue.
If HPM contracted for the duty to ensure safety, or if HPM contracted to be responsible to supervise and/or control the actual methods of construction utilized by the contractor, it may be liable. Vorndran v. Wright, 367 So.2d 1070, 1071 (Fla. 3d DCA), cert. denied, 378 So.2d 350 (Fla. 1979). However, a review of the contracts between Disney and HPM does not reveal any contractual provision that imposed a duty upon HPM to provide for worker safety. HPM's duties have been described above. While HPM was contractually charged with conducting inspections of the contractor's work, HPM's contract specifically provided that the CPM "shall not ... have control or charge of or advise on or issue directions concerning aspects of the construction means, methods, techniques, sequences; or for the procedures or safety procedures or programs in connection with the work." (emphasis supplied). The contract is unambiguous, thus, this theory must fail. See, e.g., Geer, 237 So.2d at 317-18; Conklin, 287 So.2d at 61. HPM was charged with conducting inspections and recording tests to ensure the construction of the project conformed with the contracts, but HPM had no authority to control the construction means, methods or procedures or the safety procedures used by Irey. Several witnesses testified that pressure testing was the "means and methods" of the contractor and there was no evidence to the contrary. Since there was no contractual basis for HPM to be responsible for worker safety and the method of testing was the "means and methods" of the contractor, HPM had no duty to provide for worker safety, nor to advise the contractor to conduct the pressure test with water instead of air.
An alternative theory postulated by appellants is that HPM assumed the duty to supervise the construction by its supervision and exercise of control over the means and methods employed by the contractor. This theory is purportedly based upon deposition testimony of witnesses. The testimony relied upon by appellants is equivocal and is not supported by the depositions of other witnesses. For example, appellants rely upon the deposition of Tyson, who was told after the accident occurred, by persons he did not remember, that the request to change to air testing had been made to HPM. There is no factual basis in the record to support this theory. The summary judgment entered in favor of HPM was appropriate.

V. SUMMARY JUDGMENT AS TO HE
The trial court erred in granting the summary judgment as to HE. Based upon the contract provisions between Disney and HI,[3] there is a material issue of fact as to *825 whether HE's contractual duty to review "submittals" or "other contractor-provided information" to determine compliance with the contract documents included within its scope a duty to review Irey's proposal to pressure test the pipe with air rather than water, making summary judgment improper. See Geer, 237 So.2d at 316-318; MacIntyre v. Green's Pool Serv., Inc., 347 So.2d 1081 (Fla. 3d DCA 1977). According to Ellis, that provision included within HE's obligations a duty to review Irey's proposal to pressure test the pipe with air rather than water. If that portion of the contract obligated HE to perform that duty, then it was required to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of engineers in the course of providing such services in order to avoid unreasonable risks to foreseeable plaintiffs. Geer, 237 So.2d at 316; Conklin, 287 So.2d at 61; Vorndran, 367 So.2d at 1071; Navajo Circle, Inc. v. Development Concepts Corp., 373 So.2d 689 (Fla. 2d DCA 1979); Gallichio v. Corporate Group Service, Inc., 227 So.2d 519 (Fla. 3d DCA 1969). If HE's contract required HE to approve submittals for changes in the method of testing the pipe, then HE owed Disney, and the workers affected by those changes, its professional expertise to determine that the changes met engineering standards. This question is one of fact for the jury. Thus, the summary judgment was improvidently entered.
Even if there is no duty to review the change in testing methods under HE's contract, there is a jury issue concerning whether Roger Ellis, by his actions on behalf of HE, assumed a duty to review the change in method for testing the pipe when he did not object to the change. Ellis was HE's quality control representative on the project site. He was designated as the primary site representative for HE to provide inspection services and engineering services. Ellis was HE's representative on-site to ensure that the project was built to HE's specifications. Ellis' duties included receiving questions from contractors, such as requests for information and submittals of shop drawings, and coordinating on-site work of underground piping and utilities. Although Ellis had been involved in environmental and civil engineering for 23 years, and his time was billed at the contract rate for an engineer, he was an engineering technician and not an engineer.
William Irey, as a representative of Irey, approached Ellis at a weekly progress meeting to discuss substituting air testing for water testing. HE had prepared the specifications for testing of the pipe and could authorize changes in the specifications. In specification 02718, HE had set forth water as the medium to be used for pressure testing the pipes.

Hydrostatic Test: Perform pressure and leakage tests on each section of the line between valves in accordance with AWWA C600-77. When a section of pipe of a length deemed adequate by the Engineer is ready for testing, the line shall be thoroughly blown free of air and prepared for testing. If directed by the Engineer, pipe lines shall be tested before the trench is completely backfilled.
The only entities authorized to allow a change in the medium to be used for pressure testing were Disney or HE. There is no evidence in the record that Disney authorized such a change. Ellis also admitted in his deposition that the responsibility for the change would be HE's and not Disney's. Ellis admitted that he was approached by William Irey and did not object to the change in testing medium.[4]
This evidence raises a jury question as to whether HE, through Ellis, assumed a duty regarding the means and methods of construction. *826 By exercising control over the medium to be used for the test, it can be argued that HE exercised control over the method of construction. Hanna v. Huer, Johns, Neel, Rivers and Webb, 233 Kan. 206, 662 P.2d 243, 252-54 (1983) (a professional may become responsible for the safety of workers by retaining the authority to issue change orders at the worksite and then proceeding to do so in an unprofessional or negligent manner, even if the professional contract does not include an obligation for safety). Ellis admitted that he authorized the changes and did not know that air testing was more dangerous than water testing. He also admitted that the specifications of his company required water testing.

VI. SUMMARY JUDGMENT AS TO HI
HI is the parent corporation of HE. HE did not have a separate contract with Disney. All of HE's work was performed pursuant to HI's contract. On appeal, HI argues that it assigned all of its duties for engineering services to HE orally. Since there are no written assignments and no written contracts between HE and HI, there is no record that there was an assignment and if there was, what duties were assigned from HI to HE. It is unclear what the contractual relationship between HI and HE actually was. As the moving party, HI had the burden to present evidence to the trial judge to show which of its contractual obligations it assigned to HE, i.e., whether there was a partial assignment or a total assignment of its obligations. Absent proof by the moving party, it is a jury question. See Geer, 237 So.2d 311; Schauer v. Blair Construction Co. Inc., 374 So.2d 1160 (Fla. 4th DCA 1979).
HI may also be vicariously liable for the work of HE because, as appellants alleged in their amended complaints, the contract for HE's services was signed by HI. HE is a separate legal entity whose work on the Disney project was performed under HI's contract. The trial court never ruled whether HI was vicariously liable based upon its contractual guarantee to Disney. Therefore, summary judgment in favor of HI was inappropriate.
In conclusion, we affirm the entry of the summary judgments as to Disney and HPM, but reverse as to HE and HI.
AFFIRMED in part; REVERSED in part; REMANDED.
HARRIS, C.J., concurs.
GRIFFIN, J., concurs in part; dissents in part, with opinion.
GRIFFIN, Judge, concurring in part, dissenting in part.
It is apparent from reading all three sessions of the summary judgment hearing below that the one issue about which the lower court was uncertain is the one that is the basis of the majority's reversal. Based on the following analysis, I agree with the majority's conclusion concerning Heery's duty.
Specifications prepared by Heery Engineering for the Typhoon Lagoon project called for underground installation of twenty-two inch polyethylene pipe. These specifications also required testing of the pipe after installation and called out a specific testing procedure:

Hydrostatic Tests: Perform pressure and leakage tests on each section of the line between valves in accordance with AWWA C-77. When a section of pipe of a length deemed adequate by the Engineer is ready for testing, the line shall be thoroughly blown free of air and prepared for testing. If directed by the Engineer, pipe lines shall be tested before the trench is completely backfilled.
Also required was "installation of sufficient backfill along the pipe barrels to prevent displacement during pressure testing." Verification of the integrity of the joints was the principal object of the test.
Under intense pressure from the owner to complete the job, the general contractor, Frank Irey, Jr., Inc. ["Irey"] decided that, since water was not available on site and would have to be trucked in order to conduct the test, the contractor would prefer to test with air. Although such a change did not require the issuance of a change order since it did not alter the contract price, the contract documents did require that Irey obtain *827 Heery Engineering's consent to deviate from the specifications. The record is unclear whether Heery's site engineer expressly authorized the change of air testing or whether he simply did not protest when told of it. Heery's engineer testified that he was not aware that testing with air was more hazardous than testing with water, although expert testimony was offered below that air testing is commonly understood to be more hazardous than water testing because of the compressive characteristics of air. The literature and testing specifications of the manufacturer of the pipe selected by Irey and approved by Heery also called for hydrostatic testing and sufficient backfill to prevent displacement.
Irey proceeded with testing of the polyethylene pipe with air, without backfill, and with workers assigned to work in proximity to the test sites. One of the joint welds failed during testing, causing a sudden and sharp movement of the pipe. One worker was severely injured and another was killed when struck by the pipe.
Both below and on appeal, Heery has focused the question of liability on the issue of whether Heery had any safety responsibility on the project. The answer to that question is "no"; however, the fact that insuring worker safety was not Heery's responsibility does not necessarily end the inquiry. If Heery had originally specified a testing technique that was unreasonably dangerous, in violation of sound engineering practice, Heery would be liable to any workman foreseeably injured as a result of the contractor's performing the specified dangerous testing technique. If this is so, then the engineer ought equally to be liable if its original testing specification is a safe one but it authorizes a change to an unsafe method of testing.
Heery argues that the way in which the test was conducted was a "means or method" of construction that was within the contractor's right to control and for which Heery could have no liability. In many cases, testing would be a "means or method" of construction within the power of the contractor to select. In this case, however, how the test was to be conducted was within Heery's control based on its specification.
I nevertheless dissent from the decision to reverse the summary judgment because, after scouring the testimony of the various experts in the case, I am persuaded there is no evidence in this record that by merely allowing a change in the testing specifications from water to air Heery was guilty of actionable negligence.
NOTES
[1] f/k/a Heery Engineering and Landplanning, Inc.
[2] f/k/a Heery Architect and Engineers, Inc.
[3] There is no separate contract between HE and Disney, as there was between HPM and Disney. HE appeared to be on the job site based upon the contract between HI, the parent company of HE, and Disney.
[4] Q. Do the specifications ... set forth the manner in which the 22-inch polyethylene pipe was to be tested?

A. [Ellis] Yes.
Q. And does it specify that the polyethylene pipe was to be hydrostatically tested?
A. [Ellis] Yes.
Q. What is hydrostatic testing?
A. Filled with water and  and pressurized.
.....
Q. Did you authorize Irey to substitute the pneumatic testing for the hydrostatic testing?
A. [Ellis] I did not object.
Q. You did not object?
A. [Ellis] I did not object.